The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner of formal business for the Honorable of the United States Court of Appeals for the Fourth Circuit are admonished to draw an eye and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Please be seated. Good afternoon. Welcome to the Court of Appeals. We have four cases up for argument this afternoon. We're going to start out with the case of Orellana-Torres v. Garland. We will hear from the appellant first. Thank you, Your Honor. Erica Hashimoto, Court-appointed amicus in support of Mr. Orellana-Torres. With the Court's permission, Helen Moon, a third-year law student in the Appellate Litigation Clinic at Georgetown Law Center, will present argument in support of amicus. Thank you. May it please the Court. This Court should grant the petition for review because the agency arbitrarily disregarded critical and legally significant evidence establishing that Mr. Orellana-Torres met his burdens for asylum and other immigration relief. As to the past persecution analysis of the asylum claim, Mr. Orellana-Torres' credible testimony establishes that the harm he suffered when viewed in the cumulative established a death threat constituting past persecution. But the agency failed to apply the cumulative effects of harm analysis. Can I ask you a question? You said that his credible testimony established death threats? Yes, Your Honor. So, as I understood it, it looked to me as though what the IJ credited was your client's testimony at his hearing, because the testimony at the hearing was consistent. There were some credibility questions, but the IJ thought that what he said at the hearing was consistent and credible. But at the hearing, he didn't mention anything about death threats. So how do we know that there are credible death threats on this record? Two things, Your Honor. First, the IJ deemed credible his testimony, and on page 61 of the administrative record, the IJ noted that his credibility determination rested not just on the demeanor and responsiveness to questions, but the internal consistency of testimony, including written or oral testimony. And so we asked this court to properly consider both the hearing testimony as well as the additional statements in the application as elaboration of his testimony. And second… Just as a matter of common sense, just a death threat seems like a huge thing to omit during one's oral testimony. I mean, of all the details that would jump to mind, I would think when recounting a story like this, the part with the death threat, what is the explanation for why that didn't come up at the hearing? Mr. Oriana Torres did credibly testify as to being beaten in the face with a gun during that hearing, and that is at least an implicit death threat. It is more explicit and severe than what this court has held that the brandishing of a knife was at least an implicit death threat. Here, the gun that was used is more dangerous than a knife, and it was used not just to brandish it and intimidate Mr. Oriana Torres, but it was used to actually inflict physical harm against him. And so under this court's precedent, in the presence of three key ingredients, one, which is at least this implicit death threat, two, a repeated series of threats and attacks against Mr. Oriana Torres, and three, increased severity of harm by the persecutors' knowledge of his whereabouts when they tracked him down at his workplace, later on his usual path home on a rarely traveled dirt road, and then later still at his home, viewing all of those things in the record in the cumulative, Mr. Oriana Torres has satisfied past persecution. This was not an isolated incident, but it was a systematic series of threats and escalating physical harm against Mr. Oriana Torres, and he feared for his life so much that he had to abandon his children and his partner and siblings in El Salvador in order to flee. And the third attack, in which the FMLN persecutors came to Mr. Oriana Torres' home armed with weapons and surrounded his house in search of him, appears nowhere in the IJ's opinion nor the BIA's opinion. But counsel, again, the fact that the people who came to his house were armed also doesn't appear in his testimony, or I think in any of his sort of paper declarations. Don't those details about how the people at the house were armed and threatening, doesn't that come from the affidavit of one of the supporters whose statement actually contradicted your client's statement in material respects? Two things, Your Honor. First, Mr. Oriana Torres did testify during his hearing that they returned for a third time and circled his home. And second, the affidavit statements, the IJ considered those statements. The IJ considered the inconsistencies and considered Mr. Oriana Torres' explanation as to those inconsistencies during the hearing and still deemed credible his testimony. And so the fact that that third attack occurred is uncontested. And although it occurred just days after Mr. Oriana Torres fled El Salvador, it remains relevant to the past persecution analysis because it provides vital context to understanding the meaning of the FMLN's threats when they returned to beat him, when they made additional threats against him. It showed that they had not fully realized there were threats and attacks against him during that second attack as the government contends. Their threats were not empty and there was more to come. What do you mean, the threats in general, what are the threats to, what was the basis of those threats? The threats were expressly conditioned on Mr. Oriana Torres' vote for the FMLN. And this is in the year 2014, is that correct? That's correct, Your Honor. And was it for him to vote in a particular way or just to vote? So during the first encounter, the FMLN expressly conditioned their threat suffer the consequences on his vote for the FMLN's presidential candidate. And the agency erred in determining that he was not involved politically and disregarded compelling circumstantial evidence establishing that his persecution occurred on account of his affirmative political opinion when he refused to vote for the FMLN presidential candidate. So is the allegation, or at least the threat, by individuals who ostensibly may have been employed or paid by the FMLN to harass this person or to get him to vote? Yes, Your Honor, it was because he refused to vote for the FMLN candidate that the persecution occurred. And the government itself concedes that at least the first encounter was on account of Mr. Oriana Torres' political opinion. So let me tell you where I'm going with this. We're talking about an election in 2014, and then there's another election that happened in 2019, of which I think is pretty easy. It's another country, and we know generally what happened. It's not of the record. That's the interesting thing here. We can take that notice, but it's not in the record. And typically, we don't do things if it's not a record. We have to judge the board based upon what's in the record. But in 2019, that election changed completely. And the question that I'm asking is if that threat is by the FMLN and they're no longer in power, what would be the basis for a game to continue something with no purpose to it here? So as to Mr. Oriana Torres' fear of future persecution, the fact that the 2019 elections occurred would be relevant to that. But even if that were part of the record, it would have to go back to the agency to consider if circumstances in El Salvador and the political power of the FMLN had changed such that Mr. Oriana Torres no longer has a reasonable fear of future persecution. But let me ask also, do you accept that if there is information for which is of the judicial notice variety, I'm not saying it doesn't appear, this could be, that has happened, that would abate a threat that maybe the record would have shown did exist in 2014, 16 and on? In other words, if you had someone who specifically say a particular government was harassing, but the government is overthrown, you have a totally different government, the system is different, do you think that's a reason to send it back for the board to consider whether this is information that they should consider and if it has any impact in terms of their determination? Yes, Your Honor, because Mr. Oriana Torres has established through his credible testimony that he suffered past persecution, he is entitled to a presumption of a well-founded fear and the government would have to rebut that presumption and in order to do so, that would have to go down to the agency. But I do note that the government did not raise this issue in the briefs and so I would be happy to provide supplemental briefing on this issue. Can I ask maybe a related question that's a few steps back? We often think about agencies under Chenery as requiring them to provide the rationale and so if we come in on the back end, even with judicial notice, typically we don't provide a basis that the agency itself didn't provide. Yet in the immigration context, we also have cases that say that we apply a harmless error doctrine, which seems inconsistent with Chenery's sort of underlying principle. Could we do that? I mean, strip away some of the complexity that you pointed out. If we were to find that there was evidence, judicial notice or otherwise, that would suggest a finding was harmless, but on a basis that was not suggested by the BIA, are we allowed to do that? Your Honor, I would respectfully push back because the agency disregarded credible and legally significant evidence that was probative and supported Mr. Orellana-Torres' claims for asylum and so the error is not harmless. Right, but imagine I agree with – just hypothetically, I agree with you that they ignored credible and important evidence, but I also found that there is other evidence that was also ignored that supported the ultimate conclusion. Can I rely on that other evidence or am I bound by or limited to, is maybe a better way of saying it, the rationale that the BIA or the agency provided? In this case, I don't think so, Your Honor, because under this court's precedent, it is an abuse of discretion for the agency to arbitrarily disregard probative evidence without providing clear and cogent reasons for discounting. It's an error, but the question is, we also say it can be a harmless error, and what I'm trying to say is if I found it was a harmless error based on other evidence, can we as a court reach that decision given that we're reviewing an agency's decision? I believe the court can find that an error was harmless, but this would have to be remanded to the agency to properly consider that evidence in the first instance. And if I may address the agency's reliance on unfounded speculation, the BIA failed to provide reasoned consideration of Mr. Oriana Torres' claim on an administrative appeal that the IJ was biased by the fact that he had family members living in the United States. It only repeated the claim, but provided no analysis, nor did it definitively conclude as to the claim, and its general conclusion that it found no clear error of fact in the IJ's decisions was so cursory that it deprives this court of the opportunity to meaningfully review the claim. Counsel, can I just push back on that a little bit? I understood, I think your argument here today, the way you have sort of framed the bias claim is that sort of impermissible speculation kind of tainted the IJ's fact finding. But I understood the BIA to be making kind of independent factual findings that just can't show persecution on this record. And if that's so, if that's the right reading of the BIA's opinion, then doesn't that, this isn't the technical term, but doesn't that kind of clean up any problem at the IJ level? Because we're reviewing the BIA's opinion, and the BIA didn't engage in any impermissible speculation, and it made its own factual findings, so if they're supported by substantial evidence, isn't that the end of it? I don't believe so, Your Honor, because the BIA did acknowledge the claim, but did not provide any analysis as to the claim. The BIA did when it said, we find that there wasn't, the conduct here wasn't sufficiently severe to rise to the level of persecution, and the government wasn't unable or unwilling to control, and there was no nexus. That does address, I mean, it does address your concern, if the IJ's fact finding may have been tainted by impermissible speculation, so the BIA went ahead and did it again without the speculation. Two things, Your Honor. First, this court can review both the BIA and the IJ's opinions, because the BIA explicitly affirmed and adopted and then supplemented the IJ's reasoning. It didn't say it adopted it. I'm not sure about that. I mean, we review final agency action, and I'm not sure why the BIA opinion isn't the final agency action here, because it doesn't expressly incorporate any part of the IJ's reasoning. You know, it's not one of those opinions where they say, for the reasons given by the IJ, we affirm. That's correct, Your Honor, but it does explicitly agree with the IJ's findings. For example, it says explicitly that we agree with the IJ's finding as to past persecution and well-founded fear. And second, we asked this court to consider the IJ's opinion. The IJ indulged in unfounded speculation. Well, in that regard, does it matter that the BIA opinion was a single-member opinion? Yes, Your Honor. I believe that single-member BIA opinions don't warrant the same amount of deference, but we asked this court to consider the IJ's unfounded speculation. What do you mean they're not entitled to the same amount of deference? They're not entitled under Chevron deference, but that's in another case. What's the support for the idea that a single-member BIA decision is not entitled to the same degree of deference in this very case? The case that we have, at least that I'm familiar with, does suggest single-member BIA decisions are not entitled to deference in the legal interpretation realm, but in the case that we have, they get the same degree of deference, no? Your Honor, I see my time has expired. May I briefly answer the question? You may. Thank you. Here, the BIA's opinion was a single-member decision, and it provided no reasoned explanation of that claim on administrative appeal as to the IJ speculation, and so that provides this court with an independent basis to grant the petition and remand. That's independent of the merits of the asylum claim, and I will address further questions on rebuttal. We ask this court to grant the petition. Thank you. Thank you. We'll hear from the attorney, Mr. Tennyson. Good morning. May it please the court, or afternoon. May it please the court, Robert Tennyson for the government. This panel should dismiss or deny the petition for review because it lacks – the agency's decision is supported by substantial evidence, both with regard to asylum, withholding and removal, and protection under the Torture Convention. With regard to asylum and withholding, there's no past persecution in this case, as Judge Harris pointed out. The threats or the statements of the petitioner in his testimony related only to – were statements that – or the attackers, the FMLN partisans, used were, you will suffer the consequences in the first encounter. That's very vague and inspecific. And then in the second encounter, assuming that it is still the FMLN that is acting and that they are punishing him for the acts, they responded, you will face the consequences, and they hit him on the face with the gun. That doesn't amount to a death threat. That amounts to a threat of harm at best, a threat of assault, which is neither so systematic or extreme to constitute past persecution. Moving on. Is that a factual question, like whether what happened is an implicit death threat? Right. Is that a factual decision that the IJ and BI are making? Good question. I think it is an application of the standard to the circumstances. I think the immigration judge provided sort of the factual findings here. And then what the board did is they applied that standard, right, for persecution or for passing. No, but the standard being – I mean, I'm not sure I'm following that because some things can be explicit and some things can be implicit, right? And there's not a legal standard for that, right? And that's sort of a factual question. That is an actual determination. I can tell you to stop talking or, you know, I can raise my hand, sort of implicit that you're going to stop talking when I do that. But it's just sort of a factual question, right? I couldn't just be waving at you, right? And depending on your perception, you might view it as a stop talking and you might view it as a great to see you or a variety of other possible meanings. And so I guess what I'm trying to get at is not the application of the standard but whether what happened here was an implicit death threat, which is your colleague's argument. That strikes me as a factual question. That is a factual question, Your Honor. Okay, and you're taking the next step of whether if it's an implicit something, whether that meets the standard. Meeting the standard is the legal question, but whether what happened amounts to an implicit threat of death in particular. That's a factual question we review for substantial evidence. Okay, absolutely. Can I ask you a question? If it were an implicit threat, what's the threat? I mean, as I understand it, the first encounter, he's told you better vote for the FMLN or there will be consequences. And then he doesn't. And then he's punished on the petitioner's theory for that. But I'm not understanding what the future threat would be. I mean, he already did the thing he's in trouble for. That is correct, Your Honor. He did the thing he's in trouble for, that he was told you'll suffer the consequences. And when he was hit on the face, he was told you will face the consequences. So the consequences. So it seems that you have the threat and you have the completion of the threat. And that seems to tell us – at most, that tells us what the threat was, if it was a threat, right? I mean, if you look at the first instance in the abstract, I said, you know, if I came to you and said – Well, you don't dispute the first one is a threat, right? Vote for this guy or you'll suffer the consequences. It's not a death threat, maybe. I understand that. But, you know, if you don't do X, you will suffer consequences. That strikes me as a threat. Or don't do that or you'll suffer consequences. Remember, this is in a context of a political election. It's possible that they're saying vote for them or you'll suffer consequences. You know, that the gang – the continue – the truce will continue unabated, right? Because at this point, there's the gang truce that's in place. Or you will not have, you know, the sort of the economic benefits that occur to your agricultural production. Whatever it is, you can think of a wide variety of consequences someone might be suffering. So it may very well be that kind of encounter. But given the circumstance of what happens later, I think the government is more than willing to say that this looks more like a threat. I mean it certainly looks more like a threat than it looks like just sort of some generalized proposition or assertion that, hey, there's going to – you know, if you vote, elections have consequences, right? So insofar as past persecution goes, it looks like if we read that as a threat and we know what happens at the back end that the petitioner gets punched in the face, after being told, you know, you'll face the consequences, we know what this whole, you know, this whole entity is with regard to past persecution. And that it's not an implicit death threat. It's an implicit threat of harm. And if it's an implicit threat of harm, along with the harm that he faced, that's neither so extreme nor systematic that it would constitute past persecution. So what do we make of the statements he made to the asylum officer regarding the fact that if he reported this to the police, they would kill him? Right. There are these subsequent statements. There are these previous statements to the asylum officer, as you say, Your Honor. But it looks like the immigration judge is focusing mainly on that testimony when he discusses it. For example, in his account of the petitioner's testimony, in his account of the petitioner's statements of what happened, seems to be very closely cordoned to what he said. And so in that regard, I think we rely on the factual findings, the specific factual findings the immigration judge is making come from that testimony. So would it boasted the past persecution claim statements that these men came to his house after he fled? So that's not a past persecution issue. That's after he's fled, right? He's not suffered them coming to his house. That's what I said, boasted the claim of it. Right. What, Your Honor? Boasted it. Yes. There's some sense in which you can look at that to sort of try and get a better handle on what the previous, what the persecutors may have been thinking. There are certain instances in which you can look at subsequent facts that will give you, that will inform sort of your understanding of what your persecutors are up to. But here, all we have from the testimony is a statement that the persecutors come to his house. They circle it. That's all we know. We don't know what they do. We don't know what they say because we don't have that. And we don't have that in his testimony. So is that how you square away the I.J. saying that, well, it's credible, his story is credible regarding the attack by the FMLN, but that he was being subject to a random attack by a hooligan. How can both of those findings be true? I think that's that finding that he was attacked by random hooligans. One, I don't think that the board upheld that part. I think the board very clearly, one, focused on past persecution, and then when they said it wasn't on account of it, their statements seem to indicate that that second encounter may not have been on account of his political opinion. And that's because they did not know that the petitioner did not know how they would have known he didn't vote, and he couldn't identify them as being specifically from the FMLN. So as a result, the inferences, while that first one where they say, vote or you'll suffer the consequences, we've got that, I think the board and the agency could reasonably have come to the conclusion, and that's all you need for substantial evidence, that that second event was not premised on political opinion. I don't want to lean too heavily on that because it is sort of a, I think it rides the line. But at the same time, we don't even have to get to that because here we don't have this rising to the level of persecution, given the testimony that was given by the petitioner. So are you arguing that the first attack was based on a political opinion but not the second one? Right, so we've got two different groups of people, right? The first attack is two people, they come, and there is some sort of, they obviously identify themselves as FMLN, right? And say, go vote for FMLN and suffer the consequences. The second attack, we don't have that. The second attack, he says, you know, three people, he was getting on a bus, three people came out, said, now you will suffer the consequences, which would seem to, you know, if an immigration judge or the board wanted to latch onto that and say that's the same group, that's the FMLN. And the consequences are basically the same. You've got two different groups. Right. That makes it a little less to the side of randomness. It does, Your Honor. It absolutely does. I completely agree with you. But substantial evidence doesn't require it, right? So that if a reasonable judge could say, yeah, that leans in favor of this being FMLN partisans who are following up on the previous threat or the previous statement, yes, definitely. But the immigration judge could look at those other factors out there, right? The fact that he couldn't identify who, you know, how they would have known he didn't vote or that he doesn't, you know, he states, one, with regard to gangs, do you have any idea that they are related gangs? Ultimately he says absolutely not. Or he doesn't say, let me qualify that. He says no. And he says these are unidentified individuals. They don't say anything about the FMLN when they attack it. So you've got evidence on both sides. And you're right. This statement, now you will face the consequences, does seem to lean in favor of this having, this second event having been, you know, having been the follow-on for the first event, which was based on persecution. But substantial evidence allows the immigration judge to say, well, okay, you've got that. But these other features of your narrative allow me to draw the conclusion, or I think the reasonable result inference from all of this is that that second incident was just some kind of random violence. Even though they both discussed the same consequences, one before the election and one after? I agree. I would agree with you on it. I mean, the question is, they say the word consequences. Right. They say the word consequences. But it's not necessarily, I mean, that's the challenge, is we don't really know whether they have the same consequences or not. You don't need to reach that issue, though, right? We really don't. We can just rely on the past persecution finding. Well, on that, you did say the men coming to the house. It seems like the case law says it's relevant for the boasting of the past persecution. And if it's so, there's some statement that the IHA didn't really develop that at the hearing. Our case law requires them to do so. I think that in certain circumstances it's relevant. I don't think it's relevant here. Assuming that the first and second incidents are both motivated by, and remember, the people who come to the house, we don't know who they are. The assumption is they're the people who hit him the second time. Do you maintain they're just another random group that decided to come to his house? I'm saying it's probably. Right, you're right. I think it's probably that second group that's coming to his house. But we don't know what. All we know is they circled the house, they left. We don't know what they were doing, why they were there. There's testimony, at least statements from neighbors and others about these men and what they were doing. Right, and the immigration judge didn't give those credence because they conflicted with his own statements. Remember, all of those statements had to do with what MS-13 was doing at the time. Both his sister's statement and the two other individuals all say that he was threatened by MS-13. And he expressly disavows this in his own testimony. And so the immigration judge has something to choose from. He can sort of disregard those statements. Could the immigration judge have concluded that the second, I mean, in theory, given that there was some suggestion that there was both a voting problem and a gang problem, that it was just as likely that the consequences for the second incident were gang-related and not voting-related. And the third one was just as likely to be gang-related or voting-related. And so that's part of the problem. The only one that we know is we know he was targeted. And we know in the first instance it was a voting problem. But there's at least some evidence in the record that there also, that he had done something that aroused the ire of the gang, whether true or not. There's at least some suggestion of that. And what we can't do with either the second or the third is establish whether they were gang or voting-related. I think that is correct. The earlier gang encounter occurred about six years before. But, right, we can't tell what that other event, what that second event is. And, again, I would say that that third event doesn't go, only goes to sort of how we would understand the motives. It isn't an incident of persecution. It's something different. It is, we don't read that to be an incident of past persecution. It's valuable for us to figure out, it might be valuable for us to figure out what the motives of the persecutors were doing in the past. But it's not an incident of past persecution itself. So, in other words, what you mean by that is if they showed up on the third instance and said, where's that dirty non-voter, then we could use that to draw the inference that the second attack was also a voter attack. We could do that. Right, Your Honor. But it wouldn't, but it still would. Let me ask you, in that regard, it's not just an isolated MS-13 event we're talking about here. As I understood, there was evidence that the FNLN and other political parties, they were using games to do this. Paying for money, I don't know what that meant. It's an interesting situation. I guess the purpose was to get people to vote. I don't know if it was the vote for a particular one. Probably Desire was a particular one, but the governor vote. His problem was he didn't vote at all. So you've got these members. What is this other thing that's supposed to have raised the ire of a game that caused the second, what was that? Oh, with the second incident? Yeah. What was it that he had done that made the gang want to come after him? There was no second incident. What would he have done? Well, they were mad at him because I believe there was an incident about six to eight years previous where the gangs wanted to attack a friend of his and he somehow interceded. So we have an incident six to eight years and then they show up after this first instance and basically saying you're going to suffer the consequences of what? Of something six to eight years ago? When we know there's evidence in the record that the gang is being used to harass or get people to vote. I mean, this, you know, these, these, those little, they call them the little political parties. There's a tremendous history here. And it's interesting history of it. When you hear FMLN, you think of, well, these must be terrorist groups. Well, these are people who are representing the poor peasants and stuff who become the power, but then they get in power. And I don't know. Maybe I'm not going to judge a country in terms of how its government runs, but, you know, they want to stay in power. They get in power. They're in there for one election. Got another one. I don't know how to do it. They all of a sudden just take over. And so now they begin to use these gangs to get out to vote. Well, to get them to do it, and then our, the individual here says, I'm not going to vote. I don't know anything about voting. He doesn't vote. So they get him for not voting. He didn't do anything. On the first instance, we're pretty clear on that. Then the second time it comes around, and you're saying it's because of something six to eight years ago when they say consequences? Does that sound, I mean, I'm thinking, I mean, I got, if you can pull this inference, it's a stretch in my opinion. But it could be. But I'm not feeling that one. If it had been something that happened maybe a year or something earlier, something more explicit. But we do know that gangs were being used to harass or deal with people who had not voted. And these people were in power, and it was significant to them. So let me go through three things here. The first thing I want to go through is point out that particular piece of evidence that I think you're looking at, which is a statement by a member of the Barrio 18 gang, right, which is a separate gang from MS-13. The Barrio 18 gang. Is that a gang involved here? Hmm? Is that gang involved here? No. No, Your Honor. Don't confuse me. No, Your Honor, they're not involved. This is an MS-13. It's not that anyone talks about a gang as MS-13. Or at least I don't believe that's the case. So this is the evidence in the record. This is the evidence in the record. Gangs are used to get out the vote. Right, and the way in which they get out the vote, and it's expressly in the individual's testimony, which, by the way, is stated to be unverified, and this is a blog report of a particular trial that's going on. So the statement's unverified. But what he says, how the gangs got out their vote? Well, who says? He says. Who's he? The gang member, the Barrio 18 member. The Barrio 18 member says they are using gangs to get out the vote. The way in which they do it is for the gang to have their members go out and vote, to have their families go out and vote, to have their, I guess I want to call them collaborators, go out and vote. So they're encouraging them to go out and vote. And then to get in the way of the arena voters, so to undermine the vote of the other party. There's no go and impress FMLN individuals into the vote. Do you really believe that? I mean, let's talk straight here. You're saying they are asking a gang member to go and get out the vote, and they just do what grandma and grandpa would do and kind of says, well, you ought not do it, and you go here. Or do you think they go to an MS-13 member and says get out the vote? They have a means of doing it, but it's probably not what you're talking about. That's all that we've got in the record. So we can't sort of jump and say, you know, there's some statement here with regard to the gang. I don't understand about the whole gang thing, because my understanding of what happened in this case, and tell me if I'm wrong, is that there were these affidavits in support of the petitioner, two affidavits saying he has been threatened by gang members, he has fears of gang members, he's fleeing gang members. That's what's going on here. And so he at his hearing is required to say this has nothing to do with gang members, and those men who attacked me were not gang members. So whether or not this political party is using gang members, I mean, the only testimony we had in this case from the petitioner himself is these were not gang members. Exactly, Your Honor. He says it multiple times. He disavows the involvement of the gangs. Okay. Can I ask you an entirely different question? Absolutely, Your Honor. It's about the torture prong, which I guess is not really the focus of the case here. But the amicus does argue that the BIA used the wrong standard of review in reviewing the torture finding, that it applied clear error review, which it seems to have when we held in Cruz Quintanilla, that it's at least partly a mixed question of law and fact, and it should be reviewed de novo. And you don't respond to this in your brief, and maybe this goes to Judge Richardson's question about harmless error, but shouldn't we just remand and have the BIA apply the right standard? Excellent question, Your Honor. I would say that this is probably a harmless error case. I mean, I don't think you need to send it back simply because there wasn't any evidence here of torture. The immigration judge said, I don't find a shred of evidence that the individual was tortured here. And if you look at sort of all of the country conditions reports, none of them speak about the FMLN engaging in torture. None of them, yeah, they talk about it as being party in charge. And his statements are purely about having been punched on that one occasion. So I think under a harmless error standard, there would be no reason to go back. Let me circle back briefly to the question about can we look outside the records, since that was asked previously, to look for harmless error. I think that would be, I can understand looking in the harmless error analysis at the record itself and saying, look, this record here does not give us any purchase. I mean, this record here gives us purchase for a harmless error determination. That is, the facts in this record, even if we were to send it back, there are these other things that in the record would prevent us from upholding the agency's decision. And I suspect it would be problematic, particularly because 1252, let's see, I guess it would be D2, requires the determinations of cases to be on the record, and the harmless error determination is sort of generated outside of the record. It strikes me as something that, you know, one, it's focusing on one minor thing, and maybe there's more evidence out there that the board would need to address. So it seems to me that that's, if you end up having to look outside of the record to determine whether there's harmless error, that's probably something the board needs to do. But I think that in the record here, that would establish harmless error in this case. Thank you very much. Thank you. Thank you. You have a brief rebuttal. Thank you, Your Honor. First, the government contends that Ms. Rodriana Torres has not met past persecution here, but even if this was not a death threat, the cumulative effects of the harm Ms. Rodriana Torres suffered established past persecution because of the presence of the three key factors, which is, one, the repeated and persistent series of threats and attacks against him, including the third attack, second, at least an implicit death threat in the beating with the gun, and third, the increased severity of harm by the persecutor's ability to track down his whereabouts. And although the government contends that the threat ended with the second attack, the third attack clearly shows and paints a clear picture of the FMLN's both intent and ability to follow up and continue escalating their attacks against him. That's a question I have about the escalation point. I don't see that. Like, how do we know that they're escalating? Let's assume that we're looking at the part where they circle the house. Where's the escalation in that? It shows that it was a continuation of their previous threats and attacks and that they were not done at the second attack. In fact, at the end of the second attack, they said, again, that they would come back to make him face the consequences and that they would kill him if he reported to the police. And he didn't report to the police, but they still returned, which shows the escalation. Why does that show escalation? And I don't mean to be – let me tell you my thinking. Assuming we're looking at this third attack because it sort of gives color to the first two, it seems like what it might – perhaps the more ready inference, at least, would be they're coming back maybe to hit him again. But I don't understand why we would assume from the fact that they're back that this time they're back to do something different. Why wouldn't the more ready inference be they're back to do the same thing? They sent more guns with more men, and this time they came to his house. But even if they were going to physically beat him again, even if – which we don't know – but even if that was not an intent to kill him, we don't know what would have happened because he only – he had fled just days prior. But even if that was just another physical attack, under the cumulative effects of harm analysis, that shows that this was a systematic attack against him and that this was not an escalation. It doesn't have to be escalated. Your argument does not rise or fall on this notion of escalation. It's sufficient if it stays flat, and I don't mean to trivialize this harm at all. So your argument would be it's sufficient if they plan to beat him on a regular basis. Yes, that it's a continuation of their threat and that the continuation was on the basis of his political opinion because it's legal error to require that Mr. Oriana Torres knew exactly how they knew he didn't vote. They knew he didn't vote, and he even confirmed to them that he did not vote for the FMLN. And so given his persecutors' repetition of the same threat, suffer the consequences, which they had made during the first attack, and repeated during the second attack, it naturally follows that the second attack was also on account of political opinion. The agency also disregarded circumstantial evidence of the timing that they followed up post-election and that this was a highly polarized electoral climate. The FMLN only won re-election by a razor-thin margin of 50.1 percent of the vote, and so that establishes that the persecution was on account of his political opinion. And the identity of the persecutors does not matter where, whether it was the MS-13 acting on behalf of the FMLN to further the party's interests, the persecution came from a major political party using its governmental power. And in the alternative, Mr. Oriana Torres has shown that the Salvadorean government was unable or unwilling to protect him from his persecutors. And so we ask this court to grant the petition for review and remand to the agency to consider in the first place the evidence it disregarded, but at least on the independent basis of the BIA's lack of reasoned consideration of the speculation claim. Thank you. Thank you. And I want to express on behalf of the court our appreciation to the Georgetown Law Center and the person of Mrs. Hashimoto and Ms. Munn for taking on this very difficult case. And we also thank you to Mr. Tennyson for your fine presentation. As you know, we traditionally do come down and greet you with a handshake, but that is a courtesy we dispense with in light of the great arrest of transmitting a virus to you. But who knows, we may come back when time's more normal. Thank you both for your presentations. We'll proceed to the next case.
judges: James Andrew Wynn, Pamela A. Harris, Julius N. Richardson